## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAYMOUNT URGENT CARE P.C. and ROBERT A. CLINTON, JR., | Civil Action No.: 1:25-cv-8819 |
| Plaintiffs, | |
| v. | |
| WESTWOOD FUNDING SOLUTIONS LLC, DOMINICK CURATOLA, and JOHN and JANE DOE INVESTORS, | |
| Defendants. | |

## COMPLAINT

Plaintiffs Haymount Urgent Care P.C. ("Haymount") and Robert A. Clinton Jr. ("Dr. Clinton," collectively "Plaintiffs"), as and for their Complaint against Defendants Westwood Funding Solutions, LLC ("Westwood"), Dominick Curatola ("Curatola") and John and Jane Doe Investors (collectively "Defendants"), state as follows:

## NATURE OF THE ACTION

1.     This is a RICO action against a merchant cash advance company, Westwood, that is controlled and manipulated by Defendant Curatola, to carry out a long-running scheme to collect upon unlawful debts from merchants across the United States, including Plaintiffs.

2.     On August 17, 2021, Haymount, with Dr. Clinton supplying a personal guaranty, entered a purported "Future Receivables Agreement" (the "MCA Agreement") with Westwood to which Westwood purportedly paid a lump sum to purchase Haymount's future receipts at a discount and Haymount agreed to repay the face value of its receipts through fixed specific daily payments.

3.      While couched as the purchase and sale of future receipts, the MCA Agreement's terms, and the actions of Curatola, demonstrate that despite the form of MCA Agreement, no sale of receipts ever took place, and the form of the MCA Agreement was merely a sham to evade New York's usury laws.  In reality, the MCA Agreement was substantively a loan that charged an annual interest rate of at least 204%, more than four times than the maximum 25% allowed for loans of less than $2.5 million under New York's criminal usury statute.

4.      After subtracting unconscionable sham fees, the loan advanced $164,500 and required a payback of $248,500.

5.      By November 25, 2021, Plaintiffs had repaid all principal amounts received.

6.      Thus, all amounts collected after November 25, 2021, constitute the collection of unlawful debt under 18 U.S.C. § 1962(c) and (d) and 18 U.S.C. § 1961(6).

## THE PARTIES

7.      Plaintiff Haymount Urgent Care P.C. is a North Carolina professional corporation organized under the laws of the state of North Carolina, with its principal place of business located in North Carolina.

8.      Plaintiff Robert A. Clinton Jr., M.D., is an individual and citizen of North Carolina.

9.      Defendant Westwood Funding Solutions, LLC. is a limited liability company organized under the laws of New York with its principal place of business located in Brooklyn, New York.

10.      Defendant Dominick Curatola is an individual who resides in New York.

11.      Upon information and belief, each of the John and Jane Doe Investor Defendants is a resident of New York or New Jersey.

## JURISDICTION

12.     Each Defendant is subject to the personal jurisdiction of this Court because each Defendant regularly transacts business within the State of New York, has purposefully availed itself of the laws of New York for the specific transaction at issue, or has selected New York as the forum for all disputes related to the transaction.

13.     Indeed, pursuant to the MCA Agreement, attached hereto as **Exhibit 1**, provides that "[i]f there is any suit, action, litigation, proceeding arising hereunder . . . by either party . . . then such shall only be instituted in any court sitting in the state of New York[.]" Ex. A § 4.5.

14.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a) because no Plaintiff is a citizen of the same state as a Defendant and the amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

15.     This Court also has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs claims for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO").

16.     Venue is proper because each Defendant regularly conducts business within this judicial district and consents to this venue in the MCA Agreements' forum selection clause.

## FACTUAL ALLEGATIONS

### A. The Predatory MCA Industry

14.     The MCA Industry spawned from the 2008 Financial Crisis. One of the earliest MCA companies, Yellowstone Capital LLC, was co-founded in 2009 by David Glass, an inspirational character for the movie "Boiler Room."[1] As Mr. Glass confessed to Bloomberg News,

---

[1] https://www.sec.gov/litigation/admin/2008/34-58574.pdf

"it's a lot easier to persuade someone to take money than to spend it buying stock." Just like in the movie, MCA companies utilize high-pressure boiler room tactics, employing salespersons with absolutely no financial background whatsoever.

17.    As Bloomberg previously reported, the MCA Industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[2]  The MCA Industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy." *Id.*  As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage.  There's no license you need to file for.  It's pretty much unregulated." *Id*.

**B. The MCA Agreements are Substantively and Procedurally Unconscionable**

18.    Defendants' MCA Agreements, including the one entered between Plaintiffs and Westwood, are an unconscionable contract of adhesion that were not negotiated at arms-length.

19.    Instead, they contain one-sided terms that prey upon the desperation of businesses and their individual owners and help conceal the fact that the transactions, including the one entered by Plaintiffs, are really loans.

20.    Among these one-sided terms, Westwood's MCA Agreements include: (1) a provision giving Westwood the irrevocable right to withdraw money directly from the merchant's bank account, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transfer, (3) moving or selling the business or any assets without permission from Westwood, (4) a one-sided attorneys' fee provision obligating the merchant to pay Westwood's attorneys' fees, but not the other way around, (5) a provision

---

[2] https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.

requiring the merchant to waive personal service in the event of a lawsuit, (6) a personal guarantee, the revocation of which is an event of default, (7) a jury trial waiver, (8) a class action waiver, (8) a collateral and security agreement providing Westwood a UCC lien over all of the merchant's assets, (10) a prohibition on obtaining financing from other sources, (11) maintenance of business interruption insurance, (12) an assignment of lease of the merchant's premises in favor of Westwood, (13) the right to direct all credit card processing payments to Westwood, (14) a power-of-attorney to take any and all action necessary to direct such new or additional credit card processor to make payment to Westwood, and (15) a power-of-attorney authorizing Westwood to take any action or execute any instrument or document to settle all obligations due.

21.     Westwood's MCA Agreements are also unconscionable because they contain numerous knowingly false statements including, but not limited to, that: (1) the transaction is not a loan; (2) the daily payment is a reasonable estimation of the merchant's daily receivables, (3) the fixed daily payment is for the merchant's convenience, and (4) that the automated ACH program is labor intensive and is not an automated process, requiring Westwood to charge an exorbitant $10,500 Underwriting and Origination Fee.

**C.  Defendants Use a Sham Reconciliation Provision to Disguise the Loans.**

22.     To evade state usury laws, Defendants include sham reconciliation provisions in their MCA Agreements to give the appearance that the loans do not have a definite term.

23.     Under a legitimate reconciliation provision, if a merchant pays more through its fixed daily payments than it actually received in receivables, the merchant is entitled to see the repayment of any excess money paid. Thus, if sales decrease, so do the payments.

24.      For example, if an MCA company purchased 25% of the merchant's receivables, and the merchant generated $100,000 in receivables for the month, the most that the MCA company is entitled to keep is $25,000.

25.      Thus, if the merchant paid $40,000 through its daily payments, then the merchant is entitled to $15,000 back under the sham reconciliation provision.

26.      To ensure that a merchant can never use its sham reconciliation provision, however, Defendants falsely represent that the fixed daily payment amount is a reasonable estimate of the percentage of receivables purchased.

27.      By doing so, Defendants ensure that if the merchant's sales decrease, the required fixed daily payments remain the same.

28.      For example, if 25% of a merchant's actual monthly receivables would result in a daily payment of $1,000, the enterprise falsely states that the good-faith estimate is only $500 per day so that if sales did in fact decrease by 50%, the merchant would not be able to invoke the reconciliation provision.

29.      Most importantly, Westwood ensures the reconciliation is a sham by making it entirely illusory in that the provision provides that Westwood "may" adjust the amount of payment due in its "sole discretion and as it deems appropriate." Ex. A at 1.

30.      Westwood creates further barriers to the merchant's ability to exercise a reconciliation by conditioning it on the merchant providing Westwood with bank statements. *Id.*

31.      Westwood also designs the reconciliation provision to be doomed-to-fail because it expressly provides that reconciliation will take three days to preform, *id.*, but the MCA Agreement also makes missing two daily payments an event of default. *Id.* at 9.

32.    Westwood's MCA Agreement provides that once the merchant is in default, it loses the right to reconciliation and the full amount outstanding on the loan becomes immediately due. *Id*. at 1.

33.    Finally, on information and belief, Westwood does not have a reconciliation department, does not perform reconciliations, and has never refunded merchant money as required under its sham reconciliation provision.

**D.  The Enterprise Intentionally Disguised the True Nature of the Transaction**

34.    Despite their documented form, Westwood's MCA Agreement entered by Plaintiffs is, in economic reality, a loan that is absolutely repayable.

35.    Among other hallmarks of a loan are:

   a.  The daily payment required by the MCA Agreement was fixed and the so-called reconciliation provisions were mere subterfuge to avoid this state's usury laws. Rather, just like any other loan, the purchased amount was to be repaid within a specified time by simply dividing the repayment amount by the fixed daily payment;

   b.  The default and remedy provisions purported to hold Plaintiffs absolutely liable for repayment of the purchased amount. The loan obligated Plaintiffs to ensure sufficient funds were maintained in a designated account to make the daily payments and, after just two instances of insufficient funds being maintained in the account, Plaintiffs would be in default and upon default, the outstanding balance of the purchased amount became immediately due and owing;

   c.  While the MCA Agreement purported to "assign" all of Haymount's future account receivables to Westwood until the purchased amount was paid, Haymount retained all the *indicia* and benefits of ownership of the account receivables including the right to collect, possess, and use the proceeds thereof.  Indeed, rather than purchasing receivables, Westwood merely acquired a security interest in *all* of Haymount's assets to secure payment of the purchased amount;

   d.  The MCA Agreement failed to identify specific receivables of Haymount that Westwood purportedly purchased, and it was Haymount, not Westwood, was responsible for collecting receivables Westwood allegedly purchased;

e.  Unlike true receivable purchase transactions, the MCA Agreement was underwritten based upon an assessment of Haymount's creditworthiness, not the creditworthiness of any account debtor.  Moreover, Westwood's underwriting would have revealed that Haymount had already sold its receivables to other MCA companies, making it impossible for Westwood to be purchasing Haymount's receivables as they had already been sold;

f.  The purchased amount was not calculated based upon the fair market value of Haymount's receivables, but rather was unilaterally dictated by Defendants based upon the interest rate they wanted to be paid.  Indeed, as part of the underwriting process, the Defendants did not request any information concerning Haymount's account debtors upon which to make a fair market determination of their value;

g.  The daily payment amount was determined based upon what the Defendants wanted to be paid, and not based upon any good-faith estimate of Haymount's future accounts receivables, which had already been sold;

h.  Defendants assumed no risk of loss if Haymount failed to generate sufficient receivables because the failure to maintain sufficient funds in the designated account Westwood took ACH debits from constituted a default under the MCA Agreement;

i.  Defendants assumed no risk of nonpayment if Haymount declared or was subject to involuntary bankruptcy.  If Haymount declared bankruptcy or was subject to an involuntary bankruptcy proceeding, Westwood could enforce the personal guaranty and make Dr. Clinton liable for the outstanding balance and/or execute and file a confession of judgment in favor of Westwood for the entire purchase amount.  The personal guaranty signed by Dr. Clinton further provided that "[i]n the event that [Westwood] must return any mount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount";

j.  Defendants required that Haymount make certain affirmative representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables, including a no bankruptcy warranty with any temporal restriction, and a breach of such representations and/or warranties constituted a default, which fully protected Defendants from any risk of loss resulting from Haymount's failure to generate and collect receivables;

k.  Defendants required that Haymount grant them a security interest in all of its receivables and other tangible and intangible assets and, further required that its individual owner, Dr. Clinton, personally guaranty the performance of the representations, warranties, and covenants of Haymount, which Defendants knew were breached from day one since Defendants required Plaintiffs to warrant that its

-8-

receipts were unencumbered which Defendants knew was false based on their underwriting.

## **FACTUAL BACKGROUND**

### A. **Haymount Urgent Care P.C.**

36.     At all relevant times, Haymount provided medical services to the citizens of Fayetteville North Carolina and strove to keep the community healthy by offering not only urgent care services, but also primary care to its community.

37.     Haymount offered special care to the community's veterans and is a VA-approved urgent care practice and certified to provide VA disability consultations.

38.     Haymount employed over 100 employees and saw over 300 patients per day.  Its average payroll was in excess of $250,000 per month.

39.     Haymount offered to pay up to 50% of its employees' health insurance, and provided $100,000 in life insurance (due to the risk of COVID-19).

40.     It also provided a matching 401k program and health benefits to its employees who are frontline workers.

41.     As a direct result of the COVID-19 pandemic, Haymount's funds were greatly reduced due to the facilities' choice to take precautionary expensive measures to protect its patients and employees.

42.     The main expense was the cost to provide testing to patients, e.g., set up a full PRC lab, hire additional scientists and staff, and pay for reagents and supplies.

43.     With the surge in the pandemic due to various strains (Delta in the summer of 2021 followed by Omicron), Haymount's testing numbers dramatically increased to 2,500 patients per day, requiring Haymount to look for immediate funds.

44.    Haymount also took on the added expenses to pay for personal protection equipment, cleaning supplies, and overtime, as well as other necessary expenses to protect its patients and employees.

45.    In addition to increased expenses, there was an increased need for medical care from individuals who could not afford it.

46.    As a direct result, all Haymount's revenues were greatly reduced.

47.    Haymount's revenues had been operating at approximately $60,000 per month. Expenses and revenues fluctuated with the pandemic surges.

48.    Expenses were paid two to three months prior to collecting payments on claims.

49.    With the added expense of the MCA Agreement, Haymount's profitability severely diminished.

50.    The issues related to aging receivables stemmed from a lack of collectability for patients with Medicare, TriCare for Life and slow payments HRSA (CARES ACT payments for the uninsured) and private insurance companies, all of which were overwhelmed during the COVID-19 pandemic.

51.    Prior to COVID-19, Haymount's margins were very thin.

52.    As a direct result of COVID-19, Haymount's cash flow was problematic due to slow payment from HRSA for uninsured and zero payments from Medicare.

53.    In addition to slowed payments, Haymount incurred additional expenses as a result of purchasing equipment to protect against COVID-19.

54.    As a direct result of these factors, Haymount was actively looking for long-term financing of approximately $12,000,000 over as long of a period as possible so that it could stay

afloat to help treat the community suffering during the deadly pandemic, whilst also ensuring the safety of its patients and staff.

55.    Enter Defendants.

**B.  The Usurious Loan Disguised as an MCA Agreement**

56.    Plaintiffs entered into the MCA Agreement with Westwood on September 27, 2021, during the height of the Delta variant pandemic surge.

57.    The MCA Agreement provided that Haymount was to receive an advance of $175,000 (the "Purchase Price") in exchange for the purported purchase of all Haymount's future receipts (the "Future Receipts") until such time as the amount of $248,500 (the "Purchased Amount") was repaid.

58.    Haymount, however, did not receive anywhere near $175,000 because Defendants assessed an unconscionable (1) $10,500 as an "Underwriting Fee", leaving Haymount only receiving approximately $164,500 as the true Purchase Price while remaining liable to repay the full $248,500 Purchased Amount.

59.    While the ACH Program Fee and Origination Fee purportedly related to the cost of due diligence and withdrawing the daily payments, Westwood performed little or no due diligence and the actual costs of the ACH withdrawals were a small fraction of the fee.

60.    In reality, the ACH Program Fee and Origination Fee were merely additional disguised interest.

61.    The Purchased Amount was to be repaid through daily ACH withdrawals in the amount of $2,761.11 (the "Daily Amount"), and the Purchased Amount to be repaid in just 90 business days which, on its face is a 51% interest rate, translates to an effective annual interest of

more than 204%, more than 8x the maximum 25% allowed for loans of less than $2.5 million under New York's criminal usury statute.  N.Y. Penal Law § 190.40.

62.     The fixed Daily Payment was disguised as a good faith estimate equal to 18% of Haymount's future revenue on a daily basis.

63.     Despite receiving far less than the $248,500 anticipated Purchase Price and the unconscionable and usurious effective interest rate of 204% annually, Haymount fully repaid the MCA Agreement, but did so at great cost by taking out additional MCAs from other companies, thereby creating a negative spiral of debt.

### FIRST CAUSE OF ACTION
#### (RICO: 18 U.S.C. § 1962)

64.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

**A.  The Unlawful Activity**

65.     More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

66.     In 1965, the New York Legislature commissioned an investigation into the illegal practice of loansharking which, prior to 1965, was not illegal with respect to businesses.

67.     As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment."

68.     As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

69.     This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

70.     As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

71.     The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

72.     Like here, this was a purely artificial device used by the loan shark to evade the law, an evasion that the Legislature sought to prevent.

73.     Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

74.     Defendants issue usurious loans under the guise of MCA agreements, including the MCA Agreements at issue here, to borrowers, like Plaintiffs, facing financial duress and who lack sophistication of experienced borrowers and were unaware of the predatory nature of the MCA industry.

75.     While the MCA Agreement purported to be a purchase of specific receivables, its terms actually involved Defendants' purchase of "all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers and/or other third party payers (collect, the 'Receipts', including all payments made by cash, check, electronic transfer or other forms of monetary payment in the ordinary course of the

Merchant's business), for the payments due to Merchant as a result of Merchant's sale of goods as services."

76.     While the MCA Agreement purportedly had a reconciliation provision, it was illusory because: (a) Defendants could deny any reconciliation at their "sole discretion"; (b) Defendants could deny any reconciliation if Plaintiffs did not provide sufficient documentation; and (c) the reconciliation was designed to take at least 3 days, while 2 missed daily payments during that pending reconciliation would put Plaintiffs in default while they wait for reconciliation, with said default being a basis to deny reconciliation.

77.     Defendants also ensured they had recourse in the event Plaintiffs declared bankruptcy or were placed in involuntary bankruptcy by entitling them to enforce the personal guaranty and file a confession of judgment against Plaintiffs in the full amount of the MCA Agreement.

78.     Defendants also knew they were not purchasing Haymount's receivables because their underwriting revealed that Plaintiffs had already entered into other overlapping MCA agreements, which further put the Plaintiffs in default on day-one as Plaintiffs had to warrant that their receipts were unencumbered.

79.     Thus, Defendants could elect to hold Plaintiffs in breach of the MCA Agreement at their discretion and collect the full amount through acceleration and filing a confession of judgment.

80.     All these features, and others mentioned above and evidenced on the face of the MCA Agreement, Ex. A, demonstrates it is substantively a loan with a usurious interest rate of more than 100% annually.

**B. Culpable Persons**

81.     Curatola and the John and Jane Doe Investors are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation, or limited liability company capable of holding a legal interest in property.

82.     At all relevant times, Curatola and the John and Jane Doe Investors were, and is, a person that exists separate and distinct from the Enterprise, described below.

83.     Curatola is the CEO and has an ownership interest in Westwood and is the mastermind of the Enterprise.

84.     The John and Jane Doe Investors are individuals and business entities that provide funding for the loans that the Enterprise, described below, disguises through them as MCA agreements, including the MCA Agreement at issue here.

85.     Through their operation of Westwood, the RICO Persons solicit, underwrite, service, fund and collect upon unlawful debt incurred by small businesses in states that do, and states that do not, have usury laws.

**C. The Enterprise**

86.     Curatola, Westwood, and the John and Jane Doe Investors constitute an enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

87.     Curatola, Westwood, and the John and Jane Doe Investors are associated in fact and through relationships of ownership for the common purpose of carrying an ongoing unlawful enterprise.

88.     Specifically, the Enterprise has the common goals of soliciting, funding, servicing and collecting upon usurious loans that charge annual interest rates at more than twice the enforceable rate under the laws for New York and other states.

89.     Since at least 2018 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing, and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

90.     The debt, including such debt evidenced by the MCA Agreement, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) and 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes; and (ii) the rates are more than twice the legal rate permitted under New York Penal Law § 190.40.

**D. The Roles of the RICO Persons in Operating the Enterprise, and the Roles of the Individual Companies within the Enterprise**

91.     The RICO Persons have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a common structure to operate as a unit in order to accomplish the common goal and purpose of collecting upon unlawful debts as including as follows:

**i.     Dominick Curatola**

92.     Curatola is the owner and mastermind of the Enterprise.

93.     He is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which Investors will fund each loan and the ultimate payment terms, amount and repayment period of each usurious loan.

94.     In his capacity as mastermind of the Enterprise, Curatola is responsible for creating, approving and implementing the policies, practices, and instrumentalities used by the Enterprise

to accomplish its common goals and purpose of collecting unlawful debt, including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivables purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of unlawful debt; (ii) the method of collecting the daily payment via ACH withdrawals; (iii) the amounts of disguised interest that is asserted through the Enterprise's deceitful Origination and ACH Program Fees; and (iv) the form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.

95.    All such forms were used to make and collect unlawful loans including, without limitation, the loan extended to Haymount.

96.    Curatola has also taken actions and directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including, directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans, and executing legal documents in support of the Enterprise.

97.    Curatola also plays a significant role in the Enterprise's unlawful collection tactics, including filing knowingly false and/or fraudulent affidavits in support of lawsuits and/or confessions of judgment against merchants that misrepresent or omit material facts concerning the MCA transaction.

98.    Curatola has ultimately benefitted from the Enterprise's illegal activities by funneling the usurious loan proceeds to himself and other participants in the Enterprise.

### ii.    Westwood Funding Solutions, LLC

99.    Westwood is a separate legal entity that has a legal existence separate and apart from the other members of the Enterprise and maintains its own books and records.

100.    Westwood participates and furthers the interests of the Enterprise by: (i) entering into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with investors to fund the usurious loans; (ii) pooling the funds of investors in order to fund each usurious loan; (iii) underwriting the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entering into the so-called MCA Agreements on behalf of the Enterprise, which are just poorly disguised loans; (v) servicing the usurious loans; (vi) setting-up and implementing the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (vii) obtaining judgments in its name to further collect upon the unlawful debt.

101.    In this case Westwood, through Curatola and the John and Jane Doe Investors, knowingly and intentionally: (i) solicited Haymount into entering into the MCA Agreement; (ii) pooled funds from Investors to fund the MCA Agreement; (iii) underwrote the MCA Agreement; (iv) entered into the MCA Agreement; and (v) collected upon the unlawful debt evidenced by the MCA Agreement by effectuating daily ACH withdrawals from Haymount's bank account.

### iii.    The John and Jane Doe Investors

102.    The John and Jane Doe Investors (the "Investors") are a group of organizations and/or individual investors who maintain separate officers, books, records, and bank accounts independent from other members of the Enterprise.

103.    Directly and through their members, agents, officers, and/or employees, the Investors have been and continue to be responsible for providing the Enterprise with all or a portion of the pooled funds necessary to fund the usurious loans, including the MCA Agreement, and to provide and ratify the Enterprise's effects to collect upon unlawful debts by, among other things,

approving early payoff terms, settlement agreements, and other financial arrangements with borrowers to collect upon the unlawful debt.

104.    The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

### E.  Interstate Commerce

105.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily activities.

106.    Specifically, members of the Enterprise maintain offices in Florida and use personnel in these offices to originate, underwrite, fund, service and collect upon usurious loans made by the Enterprise to entities across the United States, including Haymount in North Carolina, via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

107.    In the present case, all communications between members of the Enterprise and Haymount were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications.

108.    Specifically, the Enterprise used interstate emails to originate, underwrite, service, and collect upon the MCA Agreements, fund and advances under each of the MCA Agreements and collect Daily Payments via interstate electronic ACH debits.

109.    In addition, at the direction of Defendants, the MCA Agreement was sent from New York and executed in North Carolina, where Plaintiffs reside.

**F. Injury and Causation**

110.    Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial, but no less than $84,000 plus $23,695.20 post financing interest at 9%, equaling $107,695.20 as of October 24, 2025, the amount of unlawful debt collected by the Enterprise from Haymount.

111.    The injuries to the Plaintiffs are directly, proximately, and reasonably foreseeably resulting from or caused by Defendants' violations of 18 U.S.C. § 1962(c), including, but not limited to, hundreds of thousands of dollars in unlawfully collected criminally usurious loan payments.

112.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

113.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

<u>**SECOND CAUSE OF ACTION**</u>
**(Conspiracy under 18 U.S.C. § 1962(d))**

114.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

115.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

116.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the underwriting, funding, servicing, and collection of the unlawful loans, including with respect to the instant MCA Agreement, each

Defendant knew the nature of the Enterprise, and each Defendant knew that the Enterprise extended beyond each Defendant's individual role. Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

117.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, and/or operation of the Enterprise's affairs in order to collect upon unlawful debts pursuant to the MCA Agreement.

118.    The participation and agreement of each Defendant was necessary to allow the commission of this illegal scheme.

119.    Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial, but no less than $107,695.20.

120.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused these violations 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars in improperly collected loan payments.

121.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

122.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

### THIRD CAUSE OF ACTION
### (Unfair and Deceptive Trade Practice in Violation of N.C. Gen. Stat. § 75-1.1)

123.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

124.     Plaintiffs are entitled to recover from Defendants for unfair or deceptive acts or practices in violation of North Carolina General Statutes § 75-1.1.

125.     Specifically, Defendants engaged in unfair practices in violation of N.C. Gen. Stat. § 75-1.1 by, among other things (1) misrepresenting the nature of the MCA Agreement as a purchase of receivables to disguise its true nature of as a usurious loan; (2) misrepresenting that Plaintiffs would be able to request reconciliation or adjustments to remittances; and (3) assessing thousands of dollars in purported "fees" based on the false representation that underwriting and ACH programs were labor intensive.

126.     Because of the unfair and deceptive acts or practices engaged by Defendants, as alleged herein, Plaintiffs have been damaged in an amount to be determined at trial, but in no event less than $107,695.20.

127.     Because Defendants' unfair and deceptive acts and practices resulted in Haymount collapsing as a viable business, Plaintiffs are entitled to treble damages pursuant to N.C. Gen. Stat. § 75-16.

128.     Plaintiffs are also entitled to recover their attorney's fees against Defendants for their unfair and deceptive acts and practiced under N.C. Gen. Stat. § 75-16.1.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants, jointly and severally, and seek an Order:

a) Declaring Plaintiffs' MCA Agreement with Defendants to be a usurious loan in violation of New York Penal Law § 190.40 and thus void and unenforceable;

b) Awarding compensation, direct and consequential damages, including prejudgment interest, in an amount to be determined at trial, not less than $107,695.20;

c) Awarding treble damages pursuant to 18 U.S.C. § 1964(c) and/or N.C. Gen. Stat. § 75-16;

d) Requiring Defendants to pay Plaintiffs' attorneys fees and costs pursuant to 18 U.S.C. § 1964(c) and/or N.C. Gen. Stat. § 75-16.1;

e) Any further relief deemed appropriate by the Court.

Dated: October 24, 2025

**HESKIN & PROPER, PLLC**

/s/ Shane R. Heskin
Shane R. Heskin
641 Lexington Avenue, 14th Floor
New York, N.Y. 10022
shane@heskinproper.com
*Attorneys for Plaintiff*